UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------x
CHRISTINA KIZER,

                         Plaintiff,

            -against-                              <u>MEMORANDUM & ORDER</u>
                                                  12-CV-5387(JS)(AKT)
ABERCROMBIE & FITCH CO., ABERCROMBIE
& FITCH STORES, INC., ABERCROMBIE &
FITCH TRADING CO., doing business as
Abercrombie and Fitch, Abercrombie,
And Hollister and Ruehl,

                         Defendants.
----------------------------------------x

APPEARANCES
For Plaintiff:        Robert D. Salaman, Esq.
                      Zafer Adem Akin, Esq.
                      Emre Polat, Esq.
                      Akin Law Group PLLC
                      45 Broadway, Suite 1240
                      New York, New York 10006

For Defendants:       Barbara Vita Cusumano, Esq.
                      Bond Schoeneck & King PLLC
                      600 Third Ave., 22nd Floor
                      New York, New York 10016

                      Thomas N. McCormick, Esq.
                      Tyler Pensyl, Esq.
                      Vorys, Sater, Seymour and Pease LLP
                      52 East Gay Street
                      Columbus, Ohio 43216

                      Hilary L. McHugh, Esq.
                      Bond Schoeneck & King PLLC
                      1399 Franklin Avenue, Suite 200
                      Garden City, New York 11530

SEYBERT, District Judge:

         Plaintiff Christina Kizer ("Plaintiff" or "Kizer")

commenced this action against Abercrombie & Fitch Co.,

Abercrombie & Fitch Stores, Inc., and Abercrombie & Fitch Trading Co. (collectively, "Defendants" or "Abercrombie") asserting employment discrimination and wage and hour claims pursuant to 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Human Rights Law ("NYSHRL"), the New York City Human Rights Law ("NYCHRL"), the Fair Labor Standards Act ("FLSA"), and the New York Labor Law ("NYLL").[1]  Before the Court is Defendants' motion for summary judgment.  (Defs.' Mot., Docket Entry 66.)  For the following reasons, Defendants' motion is GRANTED.

BACKGROUND[2]

Plaintiff, an African-American woman, worked at Abercrombie from 2006 to 2014.  While she worked there, Chris

---

[1] Plaintiff voluntarily withdrew her Title VII discrimination and retaliation claims (Counts 4, 5, and 6 in the Amended Complaint).  (See Pl.'s Opp. at 6 n.3.)

[2] The facts are drawn from Defendants' Rule 56.1 Statement (Defs.' Stmt., Docket Entry 64); Plaintiff's Rule 56.1 Response (Pl.'s Stmt., Docket Entry 65, at 1-29); Plaintiff's Rule 56.1 Counterstatement (Pl.'s Counterstmt., Docket Entry 65, at 29-30); Plaintiff's Amended Complaint (Am. Compl., Docket Entry 7); Plaintiff's Deposition (Pl.'s Dep., Docket Entry 61-1); Chris Parmentar's Deposition (Parmentar Dep., Docket Entry 62-1); Adam John's Deposition (John Dep., Docket Entry 63-1); Scorcese Declaration (Scorcese Decl., Docket Entry 64-8); Kulikowski Declaration (Kulikowski Decl., Docket Entry 64-7); John Declaration (John Decl., Docket Entry 64-6); Defendants' Motion for Summary Judgment (Defs.' Mot., Docket Entry 66); Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Pl.'s Opp., Docket Entry 67); and Defendants' Reply (Defs.' Reply, Docket Entry 69).  Relevant disputes have been noted.

Parmentar ("Parmentar") was a "store director" in charge of Abercrombie's northeast stores. Adam John ("John") was a "district manager" for Long Island, and he reported to Blake Hoyle ("Hoyle"), the "regional manager" for New York. (Defs.' Stmt. ¶¶ 22, 20, 21.) Parmentar stated that as a store manager, he did not have a role in hiring and terminating employees--it was the job of the district managers. Parmentar did not consult with district managers about promotions. (Parmentar Dep. 57:7-23; 59:1-2.) John described his role as "managing, development of my managers, running the business, hiring management, supporting staffing." (John Dep. 13:18-20.)

When Plaintiff began working for Abercrombie in 2006, she was hired as a "manager in training" in one of its stores in Chicago, Illinois. In 2007, she was promoted to "assistant manager." In 2008, she quit. (Defs.' Stmt. ¶¶ 1-5.) In 2009, Plaintiff was rehired by Abercrombie and shortly thereafter again promoted to assistant manager. In 2010, an assistant manager position opened in the Roosevelt Field Mall in Garden City, New York ("Roosevelt Abercrombie"). Upon her request, Plaintiff was transferred to the Roosevelt Abercrombie. She was also given a pay increase, and she considered the move to be a promotion. (Defs.' Stmt. ¶¶ 6-10.) In May 2012, Plaintiff sought a position as a store manager at a Hollister Store in Massapequa. She did not get the job, which forms the basis of her complaint here.

(Defs.' Stmt. ¶ 19.)  Plaintiff quickly filed an internal complaint
with the company regarding the allegations.  One month later, in
June 2012, Plaintiff was promoted to "store manager" at a Hollister
store at the Broadway Mall in Hicksville, New York ("Broadway
Hollister"), where she worked until January 2014.  (Defs.' Stmt.
¶¶ 75-76.)

I.    The Sunrise Hollister Store Manager Position

        In 2012, while Plaintiff was working at the Roosevelt
Abercrombie, there was an open store manager position at a
Hollister store in the Sunrise Mall in Massapequa, New York
("Sunrise Hollister").  John considered Plaintiff and another
assistant manager, Cavan Valance ("Valance"), for the job.  (John
Dep. 115:6-16.)  He ultimately chose Valance, a white male, because
he was "someone that people looked up to," had strong recruiting
results, and built good relationships with his fellow employees.
(John Dep. 118:11-119:6.)  John noted that he also considered
Plaintiff for the job because "she was someone that [he] genuinely
liked" who "had strong work ethics."  John did not discuss his
decision with Parmentar.  (John Dep. 119:11-16; 120:18-20.)

        Plaintiff was disappointed when she did not get the
Sunrise Hollister position.  She states that Anthony Scorcese
("Scorcese"), a loss prevention agent, told her that he had heard
from Cris Kulikowski ("Kulikowski"), another employee, that during
a conference call discussing promotions, Parmentar called her

                                4

"ghetto" and said he did not want her promoted. (Defs.' Stmt. ¶ 19; Pl.'s Counterstmt. ¶¶ 1-2; Pl.'s Dep. 97:21-98:2.) According to Plaintiff, Scorcese told her that Kulikowski told him that Kulikowski, Parmentar, John, and Hoyle participated in the call. (Defs.' Stmt. ¶ 26.)

Scorcese, however, states he never told Plaintiff that Parmentar called her "ghetto" and, further, that Kulikowski never told him that Parmentar did so. (Scorcese Decl. ¶¶ 7-8, 10.) Kulikowski agrees that he did not tell Scorcese that Parmentar called Plaintiff "ghetto" and denies the alleged phone call between the four men took place. (Kulikoswki Decl. ¶¶ 7, 11.) John and Parmentar also state that the phone call never occurred. (John Decl. ¶ 10; Parmentar Dep. at 113:21-114:6.) John has never heard Parmentar use the word "ghetto" to refer to an employee or say anything about Plaintiff that could be considered racist. (John Decl. ¶¶ 12, 15; John Dep. 125:11-13.) Defendants deny that race had anything to do with Plaintiff not getting the Sunrise Hollister position.

When Plaintiff was not promoted to the Sunrise Hollister position, Plaintiff complained to Abercrombie's Human Resources Department. In addition to speaking with Plaintiff, a Human Resources representative interviewed Parmentar, Scorcese, John, Hoyle, and Laura Mayo, another manager. Parmentar denied calling Kizer "ghetto," and no one else had heard him call her that.

(Defs.' Stmt. ¶¶ 68-71.) Abercrombie thus found Plaintiff's claims could not be substantiated.

In June 2012, one month after her internal complaint, Plaintiff was promoted to the Broadway Hollister store manager position. (Defs.' Stmt. ¶¶ 75-76.) Plaintiff ultimately resigned from Abercrombie in January 2014. She claims she was "constructively discharged" because Abercrombie "creat[ed] intolerable working conditions" by not taking remedial action after she made her complaint to Human Resources.[3] (Pl.'s Opp. at 11.)

## II. Plaintiff's Other Allegations[4]

---

[3] Plaintiff stopped working for Abercrombie nineteen months after her complaint to Human Resources and several months after she was deposed for this case.

[4] At her deposition, Plaintiff indicated she believed she had been denied two other promotions during her time at Abercrombie based on her race: in Chicago in 2008, and in New York in 2010. She makes conclusory references to these incidents in her Counterstatement and Opposition. However, she made no mention of these allegations in her Amended Complaint, despite the fact that its factual assertions cover the time period from 2005 to 2012. Further, she does not address her lack of pleading in her Opposition, nor does she elaborate on the reasons she believes Abercrombie discriminated against her. The Court thus does not consider these allegations, because "[a] party cannot amend their complaint simply by alleging new facts and theories in their memoranda opposing summary judgment." Heletsi v. Lufthansa German Airlines, Inc., 99-CV-4793, 2001 WL 1646518, at *1 n.1 (E.D.N.Y. Dec. 18, 2001); see also Southwick Clothing, LLC v. GFT Corp., 99-CV-10452, 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2014) ("A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the motion.").

In her Amended Complaint, Plaintiff alleged that two other African-American women were passed over for promotions due to their race. (Am. Compl. ¶¶ 56-61.) But later, at her deposition, she denied that Defendants discriminated against one of the women based on race, conceding that what the Amended Complaint said about the discrimination and failure to promote was "not true." (Pl.'s Dep. at 125:15-126:13.) She continued to believe that the second employee, Jody Samuels, had been denied promotions due to her race and her Jamaican accent. (Pl.'s Dep. 126:10-128:22.) Plaintiff also stated that Parmentar asked her to take out the trash when he saw her and asked another male African-American employee to scrub the floor on his hands and knees. She believes that Parmentar treated her differently than other employees. (Pl.'s Dep. 130:15-136:24.)

III. <u>Plaintiff's Performance Evaluations</u>

While employed by Abercrombie, Plaintiff received several performance reviews where she was scored "needs improvement." She had issues with leadership and management, recruiting, communication, and general performance. For instance, her March 5, 2010 Quality Review noted "there have been many instances where she has been significantly late coming to work" and she has "difficulty managing her emotions/behaviors especially when given constructive feedback." Her April 29, 2011 review stated she was not "tactful when handling difficult situations.

She has even been disrespectful to upper management on a few occasions. There have even been multiple complaints about her being disrespectful to other managers and part timers as well." On March 23, 2012, her review indicated that she "need[s] a lot of work when it comes to quality in recruits" and "when dealing with customers' issues she can be too aggressive where it comes to being unprofessional." (Defs.' Stmt. ¶¶ 38-40.) Plaintiff also received several "unsatisfactory performance notes" and "poor performance notes" for yelling at her managers, hanging up on a manager on the phone, coming in late, and failing to attend management meetings. A complaint record was created when another employee alleged that Plaintiff threatened to grab her and push her through a wall. (Defs.' Stmt. ¶¶ 41-46.)

IV. Plaintiff's Overtime and Wage Claims

In 2015, numerous employees claimed that Abercrombie violated the FLSA and the NYLL. Abercrombie entered into a settlement agreement (the "Settlement Agreement") with certain employees to resolve wage and hour and overtime claims. See Settlement Agreement, Robbins et al. v. Abercrombie & Fitch Co., 15-CV-6187(FPG)(JWF) (W.D.N.Y.), Docket Entry 46. Under the Settlement Agreement, the settlement class included (1) all persons employed for one or more weeks as a "manager in training" or "assistant manager" position in New York from March 2007 until September 2014; (2) all persons employed in an assistant manager

position in Illinois from May 2012 to September 2014; and (3) employees from several other states and time periods. (Settlement Agreement ¶ 3.) The Settlement Agreement released Abercrombie from

> any and all claims . . . arising under (i) federal law or (ii) the laws of the states of . . . Illinois . . . [and] New York . . . before September 30, 2014 . . . which have been pled . . . or could have been pled . . . in the . . . complaint . . . including but not limited to claims under the [FLSA or New York Labor Law].

(Defs.' Stmt. ¶ 96.)

Plaintiff admits that she was a member of the class because she worked as an assistant manager in New York during the settlement period. (Defs.' Stmt. ¶¶ 86-87.) She also admits that she signed and cashed a $5,821.67 settlement check in November 2016. (Defs.' Stmt. ¶97.) The check stated, above the signature line,

> By signing this check and accepting these funds in compromise of back wages allegedly due under state and federal law, I provide written consent to release any claims I may have under the Fair Labor Standards Act("FLSA") prior to September 30, 2014. I agree there is no bona fide dispute over whether overtime or other wages are owed to me under the FLSA, and I accept this check as full settlement for all overtime or other wages that may be owed prior to September 30, 2014. I agree I give up any rights I may have to bring suit under the claims released in the Settlement Agreement, including claims under the FLSA.

(Defs.' Stmt. ¶ 98.)

PROCEDURAL HISTORY

On May 31, 2012, Plaintiff commenced this action by filing a Complaint in Supreme Court, Kings County, New York. Defendants removed the case to this Court and filed an Answer. (Notice of Removal, Docket Entry 1; Answer, Docket Entry 4.) Plaintiff filed an Amended Complaint on November 5, 2012. (See Am. Compl.) On December 2, 2015, Defendants moved to dismiss the action for failure to prosecute (see Defs.' Mot. to Dismiss, Docket Entry 33), which this Court denied on September 23, 2016 (see M&O Adopting R&R, Docket Entry 46). Defendants filed this Motion for Summary Judgment on January 29, 2018; Plaintiff filed her opposition on February 28, 2018; and Defendants filed their reply on March 14, 2018. (See Defs.' Mot.; Pl.'s Opp.; and Defs.' Reply.)

DISCUSSION

Summary judgment will be granted where the movant demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine factual issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed 2d 202 (1986). In determining whether an award of summary judgment is appropriate,

the Court considers the pleadings, deposition testimony, interrogatory responses, and admissions on file, together with other firsthand information that includes but is not limited to affidavits. Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011).

The movant bears the burden of establishing that there are no genuine issues of material fact. Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). Once the movant makes such a showing, the non-movant must proffer specific facts demonstrating "a genuine issue for trial." Giglio v. Buonnadonna Shoprite LLC, No. 06-CV-5191, 2009 WL 3150431, at *4 (E.D.N.Y. Sept. 25, 2009) (internal quotation marks and citation omitted). Conclusory allegations or denials will not defeat summary judgment. Id. In reviewing the summary judgment record, "'the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'" Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).

"[S]ummary judgment may be appropriate even in the fact-intensive context of discrimination cases" (Westbrook v. City Univ. of N.Y., 591 F. Supp. 2d 207, 222 (E.D.N.Y. 2008) (internal quotation marks and citation omitted)), and "the non-moving party may not rely on mere conclusory allegations nor speculation, but

instead must offer some hard evidence showing that its version of the events is not wholly fanciful" (Woodman v. WWOR-TV, Inc., 411 F.3d 69, 75 (2d Cir. 2005)). Moreover, "[a] party cannot rely on inadmissible hearsay in opposing a motion for summary judgment." Chansamone v. IBEW Local 97, 523 F. App'x 820, 822 n.4 (2d Cir. 2013) (quoting Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 924 (2d Cir. 1985)).

## I.  Discrimination Claims (Counts 1, 3, 7, 9, 10, and 12)

Plaintiff brings her discrimination claims under Section 1981, the NYSHRL, and the NYCHRL.

### A.  NYCHRL Claims

At the outset, all of Plaintiff's NYCHRL claims are DISMISSED because "[t]o state a claim under the NYCHRL, a plaintiff must allege that the defendant discriminated against h[er] 'within the boundaries of New York City.'"  McFarlane v. Iron Mountain, Inc., No. 17-CV-3311, 2018 WL 3773988 (S.D.N.Y. 2018) (quoting Shah v. Wilco Sys., Inc., 806 N.Y.S.2d 553, 558 (1st Dep't 2005) (defendant employers were entitled to summary judgment on plaintiff's NYCHRL claims where plaintiff did not work in New York City, even though plaintiff lived in New York City)); see also Robles v. Cox & Co., 841 F. Supp. 2d 615, 624 (E.D.N.Y. 2012) (a plaintiff's residence is "irrelevant to the impact analysis") (internal quotation marks and citation omitted).

B.   Section 1981 and NYSHRL Claims

The Court will analyze the Section 1981 and NYSHRL claims together, as "'[d]isparate treatment claims brought under Title VII, Section 1981, and the NYSHRL are all analyzed under the same standard.'" Johnson v. Long Island Univ., 58 F. Supp. 3d 211, 220 (E.D.N.Y. 2014) (quoting Parra v. City of White Plains, 48 F. Supp. 3d 542, at *7 (S.D.N.Y. 2014); see also Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010).

Employment discrimination claims are analyzed under the burden-shifting framework the Supreme Court established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See also Ruiz v. Cty. of Rockland, 609 F.3d 486, 491 (2d Cir. 2010); Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008). That framework requires a plaintiff to first establish a prima facie case of discrimination. To establish a prima facie case of discrimination, a plaintiff must show that: "(1) [s]he is a member of a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action;[5] and (4) the adverse action took place under circumstances giving rise to [an] inference of discrimination." Reynolds v. Barrett, 685 F.3d 193, 202 (2d Cir.

---

[5] The Court notes that an employer's "refusal to promote" may constitute an "adverse employment action." Kiernan v. Southhampton, 734 F. App'x 37, 41 (2d Cir. 2018).

2012) (fifth alteration in original) (quoting Ruiz, 609 F.3d at 491-92). The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Holcomb, 521 F.3d at 138. Once the defendant provides such a reason, "the burden shifts back to the plaintiff to demonstrate by competent evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Leibowitz v. Cornell Univ., 584 F.3d 487, 499 (2d Cir. 2009) (internal quotation marks and citations omitted).

Before turning to this framework, the Court notes that Plaintiff's primary allegation, upon which she stakes almost her entire claim, is based upon inadmissible double hearsay: that Scorcese told Plaintiff that Kulikowski told him that Parmentar called her ghetto during a conference call. (supra at 4-5.) Plaintiff has failed to identify any reason why this Court should consider this third hand statement. Further, Scorcese and Kulikowski have both denied that Parmentar called her "ghetto" and stated that the supposed phone call never even took place. (supra at 5.) Courts do not consider inadmissible hearsay when resolving a summary judgment motion. See Chansamone, 523 F. App'x at 823 n.4 ("[w]e do not consider [the plaintiff employee's] testimony that co-workers told him that [the hiring supervisor] would not hire him 'as an Asian,' because that testimony is inadmissible

hearsay"); <u>Friedman v. Swiss Re Am. Holding Corp.</u>, 643 F. App'x 69, 71 (2d Cir. 2016) (where the only evidence of a supervisor's anti-Semitism was one remark he made to another employee, who then relayed it to the plaintiff, it was inadmissible hearsay and the District Court properly granted summary judgment to the defendant employer on the plaintiff's Title VII claim); <u>Shepherd v. BCBG Max Azria Grp., Inc.</u>, No. 11-CV-7634, 2012 WL 4832883, at *17 (S.D.N.Y. Oct. 11, 2012) (where coworker told the plaintiff that their supervisor had made a disparaging remark about him, it was inadmissible hearsay and could not be used to defeat defendant employer's motion for summary judgment); <u>Kerman-Mastour v. Fin. Indus. Regulatory Auth., Inc.</u>, 814 F.Supp.2d 355, 369 (S.D.N.Y. Sep. 30, 2011) ("statements of a coworker relating allegedly discriminatory remarks made by a supervisor do not fall within [a] hearsay exception of [the Federal Rules of Evidence and a]s such, the Court will not consider it on summary judgment"). Thus, the "ghetto" statement is inadmissible.

Even assuming Parmentar's alleged statement was admissible, Plaintiff's discrimination claims would still fail.[6] First, if Parmentar did use the term "ghetto," "stray remarks, even if made by a decisionmaker, do not constitute sufficient

---

[6] The Court notes that Abercrombie has an anti-discrimination policy and trains all employees about diversity. (Defs.' Stmt. ¶¶ 14-15.)

evidence to make out a case of employment discrimination." <u>Danzer</u>
<u>v. Norden Sys., Inc.</u>, 151 F.3d 50, 56 (2d Cir. 1998); <u>see</u> <u>also</u>
<u>Johnson v. Schmid</u>, --- F. App'x ----, 2018 WL 4261672, at *3 (2d
Cir. 2018); <u>Tubo v. Orange Reg'l Med. Ctr.</u>, 690 F. App'x 736, 740
(2d Cir. 2017) ("an isolated stray [racially offensive] remark,
unconnected in any way to [an employee's] termination, is
insufficient to justify the necessary inference [of
discrimination]"). Plaintiff has not alleged that Parmentar ever
made any other racist statements, nor has she claimed that any
other peers or supervisors made similar remarks.[7] In any event,
assuming Parmentar made the remark, he was not a "decisionmaker"
here, as had no role in promotions. John made the decision to
promote Valance and he did not discuss it with Parmentar.
Plaintiff has not demonstrated employment discrimination.

Second, Abercrombie has demonstrated a legitimate, non-
discriminatory reason for promoting Valance instead of Plaintiff.
Though John had positive things to say about Plaintiff, including
that he "genuinely liked her," ultimately, he believed Valance was
"was the better candidate from a performance standpoint." (John

---

[7] Plaintiff has provided no context or argument regarding her
allegations of discrimination against two other Abercrombie
employees. In any event, her assertion that Parmentar asked her
to take out the trash and asked another employee to clean the
floor are "remote and oblique[ ] in relation to [the alleged]
adverse action." <u>Westbrook</u>, 591 F. Supp. 2d at 228 (internal
quotation marks and citation omitted).

Dep. 119:10-16; 123:14-16.)  Valance was the more effective
recruiter, and recruiting was an issue at the Sunrise Hollister.
Though John liked Plaintiff and considered her as one of two
candidates for the position, the record establishes that she had
documented performance issues over the years.  According to reviews
and notes, she had difficulty interacting with other employees and
customers, became emotional and hostile when confronted with
feedback, and had trouble with recruitment.  Plaintiff's
discrimination claims are DISMISSED.

## II.  Retaliation Claims (Counts 2, 3, 8, 9, 11, and 12)

Plaintiff brings her retaliation claims under Section
1981, the NYSHRL, and the NYCHRL.  As discussed earlier, Defendants
are entitled to summary judgment on Plaintiff's NYCHRL claims
because the alleged retaliation did not occur in New York City.
(supra at 12.)  Further, the retaliation claims are also primarily
premised on the one double hearsay statement--that Parmentar
called Plaintiff "ghetto."  As with Plaintiff's discrimination
claims, this statement is inadmissible to defeat Defendants'
motion here.

Retaliation claims are also analyzed under the McDonnell
burden-shifting framework.  A "plaintiff must set forth a prima
facie retaliation claim by demonstrating: (1) she engaged in a

protected activity;[8] (2) the employer was aware of this activity; (3) the employee suffered a materially adverse employment action; and (4) there was a causal connection between the alleged adverse action and the protected activity." <u>Bamba v. Fenton</u>, 15-CV-1340, 2017 WL 3446806, at *8 (E.D.N.Y. Aug. 10, 2017) (internal quotation marks and citation omitted).

Plaintiff's retaliation claims fail because she quite clearly suffered no adverse employment action after making her complaint to Human Resources, or even after filing this lawsuit. To the contrary, she received a promotion and continued working for Abercrombie until she resigned in 2014. In response to her initial complaint, a Human Resources representative interviewed all relevant parties. She was not terminated or disciplined in any way for filing the complaint. Plaintiff's conclusory assertion, not supported in any way, that she was constructively terminated, is not sufficient to demonstrate unlawful retaliation. She offers no explanation of the "intolerable" conditions that "forced" her to resign. (Pl.'s Opp. at 11.) Her retaliation claims thus fail and are DISMISSED.

---

[8] The Court recognizes that filing a complaint is a protected activity for purposes of a retaliation claim. <u>See</u> <u>Grant v. Hazelett Strip—Casting Corp.</u>, 880 F.2d 1564, 1569 (2d Cir. 1989).

III. <u>Intentional Infliction of Emotional Distress (IIED) Claim</u> <u>(Count 16)</u>

Plaintiff also claims that Abercrombie engaged in "extreme and outrageous" conduct intending to cause her "severe emotional distress." (Am. Compl. ¶¶ 174-75.) To succeed on this claim, Plaintiff must show that Defendants' conduct was "beyond all possible bounds of decency." <u>Howell v. N.Y. Post Co., Inc.</u>, 81 N.Y.2d 115, 122, 612 N.E.2d 699, 705, 596 N.Y.S.2d 350, 353 (1993). "Where, as here, the plaintiff premises an intentional infliction of emotional distress claim on harassment, discrimination, or retaliation in the employment context, New York courts are particularly reluctant to find that such conduct is sufficiently extreme or outrageous to satisfy this demanding standard absent a deliberate and malicious campaign against the plaintiff." <u>Robles</u>, 841 F. Supp. 2d at 631 (internal quotation marks and citation omitted). Further, "'[t]he [P]laintiff is required to establish that severe emotional distress was suffered, which must be supported by medical evidence, not the mere recitation of speculative claims.'" <u>Greenaway v. Cty. of Nassau</u>, 97 F. Supp. 3d 225, 240 (E.D.N.Y. 2015) (granting the defendants' motion for summary judgment dismissing the plaintiff's IIED claims where the plaintiff said he had seen a mental health professional, but provided only conclusory statements and no testimony or

documentation that his anxiety was severe) quoting <u>Walentas v.</u>
<u>Johnes</u>, 257 A.D. 352, 353, 683 N.Y.S.2d 56, 58 (1st Dep't 1999).

At the outset, Plaintiff's claim fails because the
"ghetto" statement is inadmissible hearsay.  Further, Plaintiff
admits that she had not been treated for any alleged emotional
issues stemming from her complaint.  (Defs.' Stmt. ¶ 115.)  She
does not identify any emotional issues she has had, other than her
conclusory statement that she "felt extremely humiliated,
degraded, victimized and embarrassed" by the alleged statement,
(Pl.'s Opp. at 13), and she did not make these claims until well
into this litigation.[9]  Plaintiff has not met the high burden
necessary to sustain an IIED claim, and it is therefore DISMISSED

IV.  <u>FLSA Claims (Counts 13, 14, and 15)</u>

In addition to her employment discrimination and
retaliation causes of action, Plaintiff has asserted wage and hour
claims under the FLSA and the NYLL.  She argues that she did not
release all her claims by participating in the Settlement Agreement
and cashing the check.  She claims that because she was employed
as an assistant manager in Illinois prior to May 2012, and the
settlement class included assistant managers employed in Illinois

_____

[9] In a prior order, this Court precluded Plaintiff from offering
an expert's report in support of her IIED claims, adopting the
Report & Recommendation of Judge Tomlinson, which noted that
"Plaintiff did not provide any responsive information concerning
emotional distress damages during the [lengthy] discovery
period."  (<u>See</u> M&O Adopting R&R; R&R, Docket Entry 40.)

only from May 2012 to September 2014, she is entitled to pursue wage claims for the period she worked in Illinois. Plaintiff's interpretation of the Settlement Agreement is incorrect: she conflates the definition of the settlement class with the scope of the settlement release.

The Settlement Agreement encompassed a class of employees from several states and various time periods. An employee could thus be a member of the class for different reasons--for example, someone who worked as an assistant manager in Illinois in 2013 would be included, and someone who worked in New York in 2008 would also be included. Plaintiff is a member of the class (which she admits) by virtue of her time as an assistant manager in New York. As a member of the class, she received a settlement check. The check advised her that upon cashing it, she would release any and all wage-related claims she could have brought under the FLSA or the NYLL prior to September 2014. She admits that she cashed the check. Therefore, she released Abercrombie from any and all wage-related claims, in any state, including Illinois, that may have accrued prior to September 2014. It is of no moment that she also worked in Illinois outside of the period that would have made her a member of the class, because she became a member of the class through her New York employment. While she would not have become a class member had she only worked in Illinois, she did become one through her New York work.

Additionally, it is clear that Judge Frank P. Geraci conducted a thorough _Cheeks_ review of the settlement agreement, which had fair, clear terms. "Requiring judicial . . . approval of such settlements is consistent with what both the Supreme Court and [the Second Circuit] have long recognized as the FLSA's underlying purpose: 'to extend the frontiers of social progress by insuring to all our able-bodied working men and women a fair day's pay for a fair day's work.'" _Cheeks v. Freeport Pancake House, Inc._, 769 F.3d 199, 206 (2d Cir. 2015) quoting _A.H. Phillips, Inc. v. Walling_, 324 U.S. 490, 493, 65 S. Ct. 807, 808, 89 L. Ed. 1095 (1945). The language on the check tracked the language of the Settlement Agreement, releasing Abercrombie from certain wage and hour claims. As Plaintiff was a member of the class and released those claims, they fail here and are DISMISSED.

<u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion for summary judgment (Docket Entry 66) is GRANTED in its entirety. The Clerk of the Court is directed to enter judgment accordingly and mark this case CLOSED.

SO ORDERED.


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:    November 20, 2018
          Central Islip, New York